In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 20-3507

WISCONSIN CENTRAL LTD.,

*Petitioner*,

*v.*

SURFACE TRANSPORTATION BOARD and UNITED STATES OF AMERICA,

*Respondents*,

*and*

SOO LINE RAILROAD COMPANY,

*Intervening Respondent*.

———————————

Petition for Review of a Decision of the
Surface Transportation Board.
Finance Docket No. 36397.

———————————

ARGUED SEPTEMBER 24, 2021 — DECIDED DECEMBER 8, 2021

———————————

Before EASTERBROOK, ROVNER, and KIRSCH, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*. Belt Railway of Chicago is the largest switching and terminal railroad in the United States, with more than 250 miles of track in its main yard just south of Midway Airport. Jointly owned by six railroads—BNSF,

Canadian National, Canadian Pacific, CSX, Norfolk Southern, and Union Pacific—Belt Railway dispatches more than 8,000 cars a day, enough to make up 40 to 50 miles of train.

An observer may suppose that Belt Railway's six owners would be able to agree on how its facilities should be used, or at least provide their own dispute-resolution mechanism. But this case pits Wisconsin Central (a subsidiary of Canadian National) against Soo Line (a subsidiary of Canadian Pacific). The question is where, in the Chicago area, Wisconsin Central will receive traffic from Soo Line. Wisconsin Central prefers Belt Railway's yard; Soo Line prefers the Spaulding yard near Bartlett, Illinois, about 25 miles to the west. The Surface Transportation Board ruled that Wisconsin Central cannot insist that Soo Line deliver to Belt Railway. 2020 STB LEXIS 428 (Oct. 29, 2020).

According to the Board, a carrier's power to designate a place where it will receive traffic is limited to portions of line that the designating carrier owns. Because Wisconsin Central does not wholly own Belt Railway, it may be used to interchange traffic only with the consent of the other carrier. We get the sense that this fight is principally about who should bear the cost of Belt Railway's services, but the Board did not resolve that dispute. Instead it held categorically that, in the absence of agreement about where to exchange traffic, the receiving carrier must designate a place on its own property.

The exchange of rail traffic is governed by statute, not by regulation or common law. The governing statute is 49 U.S.C. §10742, which provides: "A rail carrier providing transportation subject to the jurisdiction of the Board under this part shall provide reasonable, proper, and equal facilities *that are within its power to provide* for the interchange of traffic between

… its respective line and a connecting line of another rail carrier" (emphasis added). This language shows the problem with the Board's decision. The Board treated "that are within its power to provide" as if it read "that it owns." But these two phrases differ. A rail carrier can have the "power to provide" facilities as a result of contract, just as it can have that power by ownership. Treating ownership as a *sine qua non* cuts down on the scope of this statute.

The Board also wrote that §10742 does not apply in the first place unless the two railroads have physically intersecting lines. Yet the statute does not contain such a condition precedent, and the phrase "within its power to provide" is inconsistent with this supposed condition. True, the statute has the phrase "connecting line", but we know from *Atlantic Coast Line R.R. v. United States*, 284 U.S. 288, 293 (1932), that "connecting line" can include connection through an intermediary—and we so held about a predecessor to §10742. See *Atchison, Topeka & Santa Fe Ry. v. Chicago*, 240 F.2d 930, 936–37 & n.17 (7th Cir. 1957), affirmed, 357 U.S. 77 (1958).

The Board discussed at length what amounts to a common-law tradition under which receiving carriers that designate interchange locations on their own lines also allow the delivering carriers free transportation over those lines to reach the place where the cars will be switched. According to the Board, designation of Belt Railway would frustrate this free-transit aspect of historical practice. But it did not explain why that is so.

If the parties cannot agree about where to exchange traffic, three distinct questions could require resolution: (1) may the receiving carrier ever designate a willing third party to receive traffic on its behalf?; (2) if yes, is the proposed location

for interchange "reasonable" (another important word in §10742) compared with the place where switching otherwise would occur?; (3) if yes to both of these questions, who pays the third party? By mixing these up, and smuggling an assumption about the answer to Question 3 into its decision about Question 1, the Board erred.

In addition to making an assumption about expense, the Board relied on a common-law norm that a delivering railroad cannot compel a receiving railroad to exercise a contractual right to require a third party to receive traffic. The Board thought that it follows from this that Wisconsin Central cannot compel Soo Line to deliver cars to Belt Railway. It is far from clear that §10742 supports the Board's view that a delivering railroad cannot compel a receiving carrier to accept traffic at a place that by contract is within the receiving carrier's "power to provide". But suppose the Board is right. Wisconsin Central, the receiving line, is willing to accept traffic through the Belt Railway, and Belt Railway is willing to accept that traffic. Whether Soo Line can be required to tender its traffic there rather than at the Spaulding yard depends on the language of the statute, not on extra-statutory doctrines.

Still, the Board insists, it is entitled to resolve such issues for itself with the benefit of judicial deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). We do not think that *Chevron* helps the Board, for two reasons. First, the phrase "that are within its power to provide" is not ambiguous and cannot reasonably be treated the same as "on its own track." Second, the Board did not even *purport* to be making policy choices using authority delegated by Congress. Cf. *United States v. Mead Corp.*, 533 U.S. 218 (2001). It did not see any ambiguity in the statutory language

or the historical practice; instead the Board wrote that it was applying a deterministic framework established long ago. By taking that approach, the Board cut itself off from any support in *Chevron*. See, e.g., *Meza Morales v. Barr*, 973 F.3d 656, 667 n.7 (7th Cir. 2020); *Transitional Hospitals Corp. v. Shalala*, 222 F.3d 1019, 1029 (D.C. Cir. 2000); *Alarm Industry Communications Committee v. FCC*, 131 F.3d 1066, 1069 (D.C. Cir. 1997). The statutory word "reasonable" gives the Board interpretive leeway; the statutory phrase "that are within its power to provide" does not.

The petition for review is granted, the Board's decision is vacated, and the matter is remanded for further proceedings consistent with this opinion.